# In the United States Court of Federal Claims

No. 11-562C
Filed: December 29, 2011
**TO BE PUBLISHED**[1]

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

| | |
|---|---|
| | * Post-Award Bid Protest, |
| AKAL SECURITY, Inc., | *     28 U.S.C. § 1491(b)(1); |
| | * Jurisdiction; |
| Plaintiff, | * Standing; |
| | * Intervenor, RCFC 24(a); |
| v. | * Judgment on the Administrative Record, |
| | *     RCFC 52.1; |
| | * Administrative Procedure Act, |
| THE UNITED STATES, | *     5 U.S.C § 706; |
| | * Responsibility Determination; |
| Defendant, | * Disparate Treatment; |
| and | * Federal Acquisition Regulation 15.308; |
| | * Source Selection Authority Independent |
| METROPOLITAN SECURITY SERVICES, Inc., | * Judgment; |
| | * Source Selection Authority Comparative |
| Defendant-Intervenor. | * Assessment; |
| | * Best-value procurement. |

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

**Terrence M. O'Connor**, Berenzweig Leonard, LLP, McLean, Virginia, Counsel for Plaintiff.

**Joshua A. Mandlebaum,** United States Department of Justice, Civil Division, Washington, D.C., Counsel for Defendant.

**James Scott Phillips**, Centre Law Group, LLC, Vienna, Virginia, Counsel for Defendant-Intervenor.

## MEMORANDUM OPINION AND FINAL ORDER

**BRADEN, *Judge*.**

---

[1] On December 21, 2011, the court forwarded a sealed copy of this Memorandum Opinion and Final Order to the parties to redact any information considered to be confidential and/or privileged, and note any editorial errors requiring correction. The court has incorporated those comments, and corrected, or clarified, certain portions herein. Therefore, portions of this Memorandum Opinion and Final Order are redacted, as indicated by the notation "[redacted]." This redacted version and a non-redacted version have been filed on this date with the Clerk of the United States Court of Federal Claims.

On September 2, 2011, Akal Security, Inc. ("Akal") filed this bid protest action challenging the May 13, 2011 award by the United States Marshals Service ("USMS") of a contract to provide Court Security Officer ("CSO") services for the Fourth Circuit to Metropolitan Security Services, Inc. d/b/a Walden Security ("Walden"). Akal contends that several errors in the procurement rendered the contract award arbitrary, capricious and an abuse of discretion, including: the responsibility determination for Walden, several aspects of the final technical ratings for both Akal and Walden, and the Contracting Officer's award recommendation. Akal also contends that the procurement violates FAR 15.308 because the Source Selection Authority failed to exercise independent judgment. For the reasons discussed herein, the court has determined that Akal's contentions are without merit, and therefore the action should be dismissed.

To facilitate review of this Memorandum Opinion and Final Order, the court has provided the following outline:

I.      RELEVANT FACTS.

II.     PROCEDURAL HISTORY.

III.    DISCUSSION.

    A.      Jurisdiction.

    B.      Standing.

        1.      Plaintiff Has Standing.

        2.      Defendant-Intervenor Has Standing.

    C.      Standard Of Review.

    D.      Whether The Contracting Officer's Responsibility Determination Was Arbitrary, Capricious, Irrational Or Unlawful.

        1.      Plaintiff's Argument.

        2.      The Government's Response.

        3.      The Intervenor's Response.

        4.      The Court's Resolution.

    E.      Whether The TEB's Evaluation Of Plaintiff's And Intervenor's Proposals Was Arbitrary, Capricious, Or An Abuse Of Discretion.

        1.      Whether The TEB's Evaluation Of The Corporate Experience Factor Was Arbitrary, Capricious, Or An Abuse Of Discretion.

a.      **Plaintiff's Argument.**

b.      **The Government's Response.**

c.      **The Intervenor's Response.**

d.      **The Court's Resolution.**

2.      **Whether The TEB's Failure Adjust Technical Scores In The Final Report Was Arbitrary, Capricious, Or An Abuse Of Discretion.**

a.      **Plaintiff's Argument.**

b.      **The Government's Response.**

c.      **The Intervenor's Response.**

d.      **The Court's Resolution.**

3.      **Whether The TEB Engaged In Disparate Treatment In Evaluating Plaintiff's And Intervenor's Proposals.**

a.      **Plaintiff's Argument.**

b.      **The Government's Response.**

c.      **The Intervenor's Response.**

d.      **The Court's Resolution.**

F.      **Whether The Award Decision Violates FAR 15.308.**

1.      **Plaintiff's Argument.**

2.      **The Government's Response.**

3.      **The Intervenor's Response.**

4.      **The Court's Resolution.**

G.      **The Contracting Officer's Award Recommendation Was Arbitrary, Capricious, And An Abuse Of Discretion.**

1.      **Plaintiff's Argument.**

2.      **The Government's Response.**

3.      **The Intervenor's Response.**

4.      The Court's Resolution.

IV.    CONCLUSION.

* * *

I.    RELEVANT FACTS.[2]

On April 6, 2010, the United States Marshals Service issued Solicitation No. DJMS-10-R-0022 ("RFP") to procure CSO services for all federal courthouses.[3]  AR Tab 2 at 8.  The RFP required offerors to submit one Technical Proposal for all federal circuit courts and a separate Price/Business Proposal for each circuit.  AR Tab 2 at 127.  Contracts were to be awarded to an offeror that presented the "best overall value."  AR Tab 70 at 2427.  In other words, for each circuit, the lowest price would be the "determin[ative] factor" among "substantially technically equal" proposals.  AR Tab 70 at 2427.

The RFP summarized the technical factors considered and their relative weights in the following chart:

| TECHNICAL NUMERICAL SCORING | | | |
|---|---|---|---|
| Evaluation Factor | Weight | Maximum Rating | Maximum Points |
| **Technical Ability to Perform SOW** | | | |
| General Understanding of SOW | 4 | 5.00 | 20 |
| Ability to recruit and furnish qualified applicants | 3 | 5.00 | 15 |
| Ability to maintain required CSO standards | 3 | 5.00 | 15 |
| Develop and conduct annual training/weapon | 3 | 5.00 | 15 |
| **Contract Management** | | | |
| Qualifications of Key Personnel (Principals) | 1 | 5.00 | 5 |
| Corporate Experience | 2 | 5.00 | 10 |
| **Past Performance** | | | |
| Past Performance | 4 | 5.00 | 20 |
| **TOTAL (possible) SCORE** | | | **100** |

---

[2] The facts in this case are derived from the Administrative Record 1-8599, that has been divided into Tabs 1-93 ("AR Tab ___ at ___").

[3] For purposes of security services, USMS divides federal courthouses into twelve circuits. AR Tab 1 at 2.  The first eleven circuits correspond to the eleven numbered United States Courts of Appeals, and the twelfth circuit corresponds to all federal courthouses in the District of Columbia.  AR Tab 1 at 2.

AR Tab 7 at 830 (Amendment No. 4 to Solicitation No. DJMS-10-R-0022); *see also* AR Tab 58 at 2064 (Source Selection Plan) (showing same chart).  Among other requirements listed in the RFP and evaluated under the above factors according to the Source Selection Plan ("SSP"), the "Ability to recruit and furnish qualified applicants" and "Ability to maintain required CSO standards" sub-factors required a successful offeror to recruit and employ only CSOs who meet USMS qualifications.  *See* AR Tab 58 at 2075-76 (Individual Technical Evaluation Forms for both sub-factors); *see also* AR Tab 70 at 2320-21 (RFP section C-11, listing CSO qualification standards).  In addition, the "Develop and conduct annual training/weapon" sub-factor required a successful offeror to conduct at least 8 hours of mandatory annual training for all CSOs in areas such as detecting explosives and handling unruly persons.  *See* AR Tab 58 at 2077 (Individual Technical Evaluation Form); *see also* AR Tab 70 at 2328 (RFP section C-13, discussing required annual minimum CSO training requirements).

The RFP defined "Relevant Experience" as:

[T]he opportunity to learn by doing similar work under similar conditions.  The offeror's experience is relevant to this competition when similar or the same work performed work [sic] has lead [sic] to the same kinds or types of challenges that would be faced during performance of the work described in this solicitation.  USMS will assess the offeror's relevant experience on the basis of its breadth (how many similar contracts/tasks have been performed in the past) and its depth (how many times the offeror has performed such contracts/tasks).  Thus, relevant experience is a measure of what and how much similar work the offeror has completed.

AR Tab 70 at 2429 (RFP section M-1); *see also* AR 58 at 2079 (Individual Technical Evaluation Form for "Corporate Experience" sub-factor referencing RFP section M).

"Corporate Experience" was to be rated based on the following standards:

| *Rating Scale 2 – CONTRACT MANAGEMENT (Corporate and Key Personnel/Experience)* | | |
|---|---|---|
| Rating | | Definition |
| Numerical | Adjectival | |
| 5 | Excellent | [redacted] |
| 4 | Very Good | [redacted] |
| 3 | Satisfactory | [redacted] |
| 2 | Marginal | [redacted] |
| 1 | Poor | [redacted] |

AR Tab 58 at 2091.

In addition, USMS considered the responsibility factors listed in FAR 9.104-1 and 9.104-2, as well as Special Standards of Responsibility, listed in RFP Section L-15.  AR Tab 70 at 2430.  The Special Standards of Responsibility required an offeror to demonstrate financial responsibility by showing "financial assets sufficient to support at least three months of total payroll and all other operating expenses attributable to the quality and satisfaction of the

requirement, terms and conditions contemplated in the contract." AR Tab 70 at 2422. To establish its responsibility, an offeror was required to submit "evidence and documentation" of the "ability to meet all resources required to successfully perform all contract terms and conditions." AR Tab 70 at 2422. Among other documents that offerors "may be required to provide" was the "[d]isclosure of any threatened, pending or current litigation." AR Tab 70 at 2423.

In May 2010, Akal, Walden, and several other firms, submitted proposals to provide CSO services. AR Tab 66 at 2231-32. Akal submitted a technical proposal for all twelve federal circuit courts, emphasizing that it currently deploys 8,000 armed and unarmed security officers and is the incumbent CSO provider for eight federal circuits. AR Tab 18 at 987, 1068. Akal's final proposed price for the Fourth Circuit was $[redacted]. AR Tab 65 at 2191. Walden submitted proposals for eight of the federal circuits, including the Fourth Circuit, emphasizing its corporate capabilities and value added benefits. AR Tab 17. Walden's final proposed price for the Fourth Circuit was $164,367,073.50. AR Tab 65 at 2191.

After submission of proposals, a Technical Evaluation Board ("TEB") evaluated the Technical Ability and Contract Management factors, and a Past Performance Evaluator evaluated the Past Performance factor. AR Tab 58 at 2056-57. First, each TEB member scored the proposals. AR Tab 66 at 2233; *see also* AR Tab 60 (initial individual technical evaluations for Walden), AR Tab 61 (initial evaluations for Akal). Next, a TEB Consensus Report was submitted to the Contracting Officer ("CO") that listed the TEB's questions/clarifications, summarized the strengths and weaknesses of proposals, and provided averaged technical scores. *See* AR Tab 59 (TEB Consensus Report); *see also* AR Tab 66 at 2233.

The TEB Consensus Report gave Akal 68.8 out of 80 points. AR Tab 59 at 2095. Walden received 77 out of 80 points. AR Tab 59 at 2100. Specifically, Akal received 12 out of 15 points for "Ability to Recruit and Furnish Qualified Applicants," with three strengths and two questions/clarifications for this sub-factor. AR Tab 59 at 2096. For the same sub-factor, Walden received 15 out of 15 points with six identified strengths. AR Tab 59 at 2100, 2102. For the "Develop and Conduct Annual Training" sub-factor, Akal received 12 out of 15 points, with three identified strengths, one weakness, and one question/clarification. AR Tab 59 at 2095, 2098. For the same sub-factor, Walden received 12 out of 15 points, with three identified strengths and one weakness. AR Tab 59 at 2100, 2104. For the "Corporate Experience" sub-factor, Akal was rated "Very Good" and received 8 out of 10 points. AR Tab 59 at 2095. Walden was rated "Excellent" and received 10 out of 10 points. AR Tab 59 at 2100. Overall, the Consensus Report listed a number of strengths, one weakness, and no questions/clarifications for Walden's proposal. AR Tab 59 at 2101-06. As to Akal, the Consensus Report identified a number of strengths, two weaknesses, and six questions/clarifications. AR Tab 59 at 2196-99; AR Tabs 86-87 (Consensus Report score sheets for Akal for "General Understanding of the SOW" and "Qualifications of Key Personnel (Principals)" sub-factors which were originally omitted from the Administrative Record).

The TEB Consensus Report was then used to make a competitive range determination on July 9, 2010. AR Tab 66 at 2234. Thereafter, USMS entered into discussions with potential offerors. AR Tab 66 at 2237-38; *see also* AR Tabs 19-30, 33-35, 82-83, 93 (discussions with

Walden); AR Tabs 39-50, 84-85 (discussions with Akal).  The CO asked Walden to disclose all "threatened, pending or current litigation."  AR Tab 23 at 1149.  Walden also was asked to address "concern[s]" about Walden's price in light of its having no prior "experience with the USMS[,]" and to expand on the company's "ability to handle the number and size of the CSO contracts for the 12 Circuits for which [Walden] has made an offer."[4]  AR Tab 25 at 1156. Another area of inquiry was Walden's arrangements to acquire "suitable firearm ranges."  AR Tab 30 at 1251.

In response, Walden disclosed 12 recent, pending, or threatened lawsuits, including *William Bonner* v. *Metropolitan Security Services, Inc.*, No. 10-937 (W.D. Tex. filed Nov. 17, 2010) ("the *Bonner* lawsuit"), a class action brought by Walden employees under the Fair Labor Standards Act, alleging that Walden failed to compensate employees in full, because they were not relieved from duty during meal breaks.[5]  AR Tab 24 at 1151-53.  Walden also expanded on its experience, focusing on its Fort Hood and Centers for Disease Control ("CDC") security contracts.  AR Tab 26 at 1165-68.  In addition, Walden addressed concerns about its price and lack of experience with the CSO program.  AR Tab 26 at 1163-64.  Finally, Walden addressed its plans to obtain suitable firearm range agreements.  AR Tab 93 at 8597-98.

Akal addressed two questions/clarifications on the "Ability to Recruit and Furnish Qualified Applicants" sub-factor.  AR Tab 49 at 1576 (stating that shared positions would be authorized on a one-to-three ratio); AR Tab 85 at 8555-56 (discussing understanding of costs and investigations associated with filling a temporary CSO position when a CSO is called to active military duty).  In addition, Akal addressed a weakness and a question/clarification regarding the "Develop and Conduct Annual Training" sub-factor.  AR Tab 49 at 1578 (stating that the government has the right to observe weapons-proficiency testing); AR Tab 85 at 8553-54 (concerning range plans/agreements).  After these discussions, USMS concluded that all weaknesses for both Akal and Walden were "mitigated."  AR Tab 65 at 2194.

In April 2011, the TEB reevaluated the proposals and issued a Final Report to the CO. AR Tab 62 at 2165-66.  The TEB findings, plus the past performance scores, for Walden and Akal are summarized in the following chart:

---

[4]  As Walden noted, it actually only bid for eight circuits.  AR Tab 26 at 1165.

[5]  Akal disclosed 134 threatened, pending, or current litigation matters, including allegations of pay and labor regulation violations.  AR Tab 44 at 1488-94.  Akal's disclosure, however, did not mention an ongoing Department of Justice (DOJ) Office of the Inspector General (OIG) investigation that was disclosed by the DOJ prior to the award of the contracts. AR Tab 88 at 8561, 8564-65.

|  | General Understanding of the SOW | Ability to Recruit Qualified Applicants | Ability to Maintain CSO Standards | Develop and Conduct Annual Training to Include Weapons Proficiency | Qualifications of Key Personnel (Principals) | Corporate Experience | Overall Technical Score | PP | Total |
|---|---|---|---|---|---|---|---|---|---|
| Max Points | 20 | 15 | 15 | 15 | 5 | 10 | 80 | 20.00 | 100 |
| WALDEN | 20 | 15 | 15 | 12 | 5 | 10 | 77 | 17.10 | 94.1 |
| AKAL | 20 | 12 | 12 | 12 | 5 | 8 | 69 | 15.50 | 84.5 |

AR Tab 66 at 2238 (edited to remove scores for non-party offerors).

As the chart shows, Walden earned a technical score of 77, the highest of all the offerors. AR Tab 66 at 2238. Akal earned a technical score of 69. AR Tab 66 at 2238; *see also* AR Tab 62 at 2166 (showing TEB Final Report score summary). When the technical score and past performance evaluations were combined, Walden earned a total score of 94.1, the highest rating, and Akal earned a total score of 84.5, the second highest rating. AR Tab 66 at 2238.

Under the "Ability to Recruit and Furnish Qualified Applicants" sub-factor, the TEB Final Report identified three additional strengths for Akal for a total of six strengths, but Akal's score on this sub-factor did not change from the Consensus Report. *Compare* AR Tab 62 at 2169-70, *with* AR Tab 59 at 2095-96. For the same sub-factor, Walden had three strengths listed, but its score for this sub-factor also did not change from the Consensus Report. *Compare* AR Tab 62 at 2167, *with* AR Tab 59 at 2100.

Under the "Develop and Conduct Annual Training" sub-factor, the Final Report identified two additional strengths for Akal, for a total of five strengths. AR Tab 62 at 2170-71. Again, Akal's score on this sub-factor did not change. *Compare* AR Tab 62 at 2170, *with* AR Tab 59 at 2095. Walden's score also did not change for this sub-factor. *Compare* AR Tab 62 at 2168, *with* AR Tab 59 at 2100.

As for the "Corporate Experience" sub-factor, the Final Report noted that Walden "currently provides [redacted]." AR Tab 62 at 2169. As to Akal's "Corporate Experience," the Final Report noted that "[Akal] has 18 years experience with the CSO program" and that "[Akal] is the incumbent for CSO program in 9 circuits."[6] AR Tab 62 at 2171. In sum, "[Akal] has extensive and relevant experience managing armed security service projects that are very similar in size and scope[.]" AR Tab 62 at 2171.

Throughout the discussion period prior to contract award, Akal and Walden provided legal and financial information in response to USMS requests, and USMS hired the accounting firm Deloitte to conduct a pre-award analysis of both Akal and Walden. *See generally* AR Tabs 63-64; *see also* AR Tab 36 (Deloitte analysis of Walden), 51 (Deloitte analysis of Akal). Thereafter, USMS determined that both Akal and Walden satisfied the responsibility factors

---

[6] In fact, Akal was the incumbent CSO provider in only eight federal circuits. AR Tab 18 at 1068.

Case 1:11-cv-00562-SGB   Document 78   Filed 12/29/11   Page 9 of 35

listed in FAR 9.104-1 and 9.104-2 and the Special Standards of Responsibility listed in RFP Section L-15.  AR Tabs 63 (Determination of Responsibility for Walden), 64 (Determination of Responsibility for Akal).

Based on the TEB Final Report, Walden tentatively was recommended as the awardee for all of the eight circuit contracts for which it competed.  AR Tab 66 at 2239.  The CO and Walden agreed, however, that Walden did not have the financial capability to meet the Special Standards of Responsibility for all eight circuits.  AR Tab 66 at 2239.  Therefore, in an email dated May 6, 2011, Walden agreed to withdraw from consideration for all but the Fourth Circuit contract, for which it did satisfy the Special Standards of Responsibility requirements.  AR Tab 38 at 1430; *see also* AR Tab 66 at 2239.

In a subsequent memorandum ("CO Award Recommendation") to the Source Selection Authority ("SSA") dated May 13, 2011, the CO assessed each offeror's comparative qualifications.  *See* AR Tab 65 at 2190-98.  In the CO Award Recommendation, the CO recommended that Walden be awarded the Fourth Circuit contract.  AR Tab 65 at 2190-91, 2194-95.  The CO noted that Walden had the highest technical score and a total price of $164,367,073.50.  AR Tab 65 at 2191.  This price was lower than Akal's price of $[redacted].  AR Tab 65 at 2191.  A third offeror had a lower price than Walden at $[redacted], but the CO determined that this price advantage was outweighed by Walden's "technical superiority."  AR Tab 65 at 2191.  The CO Award Recommendation also listed other reasons why Walden earned a higher technical score than Akal: Walden's ability to manage and expand security coverage for special situations, Walden's process for screening CSO candidates, Walden's quality assurance plan, Walden's training plan, and Walden's higher past performance score.  AR Tab 65 at 2194-95.  The CO Award Recommendation also recommended that Akal be awarded the contracts for the eleven other federal circuits despite a higher price than other offerors in the competitive range.  AR Tab 65 at 2191-93.

The SSA, Albert D. Hemphill, II, then approved the recommendations of the CO for all twelve circuits by signing his name on the CO Award Recommendation next to the word "Approved[.]"[7]  AR Tab 65 at 2198.  On May 13, 2011, USMS awarded the Fourth Circuit CSO contract, Contract No. DJMS-11-D-0504, to Walden.  AR Tab 80 at 7816.

On August 8, 2011, the Regional Solicitor for the Dallas Region of the Department of Labor ("DOL"), filed a Complaint against Walden with the DOL's Office of Administrative Law Judges, following an investigation of Walden's security guard services for the Department of the Army at Fort Sam Houston in Texas.  *See* Plaintiff's Motion For Judgment On The Administrative Record ("Pl. Mot."), Exhibit 1 ("DOL Complaint").  The DOL Complaint alleged

---

[7] G4S Secure Solutions-USA, Inc. and Inter-Con Security Systems subsequently filed bid protests with the GAO contesting the award of the other eleven federal circuit contracts to Akal.  AR Tab 91, 92; *see also G4S Secure Solutions-USA, Inc.*, B-402528.4; *Inter-Con Security Sys., Inc.*, B-403538.2, B-403538.4.  In response, USMS decided to: revise the TEB Final Report to include all strengths identified by the TEB; compare the technical proposals of Akal, Inter-Con, and G4S Secure Solutions; and issue a new source selection decision.  AR Tab 90.  G4S and Inter-Con subsequently withdrew their bid protests.  *See* AR Tab 91, 92.

that Walden had violated certain labor laws and regulations, *i.e.*, 41 U.S.C. § 351(a)(1) and 29 C.F.R. § 4.6(b) (failure to pay minimum wages required by an Army contract); 41 U.S.C. § 351(a)(2) and 29 C.F.R. § 4.6(b) (failure to furnish fringe benefits required by an Army contract); and 40 U.S.C. § 3701, et seq., and 29 C.F.R. § 5.5(b)(1) (failure to furnish overtime compensation required by an Army contract). DOL Complaint ¶¶ 5-7. The Complaint seeks $510,991.70 for "underpayments of compensation to employees." DOL Complaint ¶ 7. The Complaint also states that Walden is subject to the debarment provisions of 41 U.S.C. § 354(a). DOL Complaint ¶ 7.

## II.  PROCEDURAL HISTORY.

On September 2, 2011, Akal filed a Bid Protest Complaint, under seal, in the United States Court of Federal Claims. On that same day, Akal also filed: a Motion For Preliminary Injunction and a Motion For Temporary Restraining Order, with a Memorandum In Support; a Rule 7.1 Disclosure Statement; and a Motion To Seal The Complaint. On the same day Walden filed a Motion To Intervene.

On September 6, 2011, the court convened a Status Conference to discuss how the case should proceed. On that same day, Akal filed an Unopposed Motion For Protective Order and a Proposed Protective Order.

On September 7, 2011, the court granted Walden's Motion To Intervene and Akal's Unopposed Motion For Protective Order.

On September 9, 2011, the court convened a status conference wherein the parties discussed a schedule for submission of the Administrative Record and briefing.

On September 12, 2011, the Government filed a Motion For Extension Of Time to file a Response to Akal's Motion For Temporary Restraining Order and Motion For Preliminary Injunction.

On September 13, 2011, the Government filed a Joint Proposed Pretrial Scheduling Order. On that same date, Akal filed a Response to the Government's September 12, 2011 Motion For Extension Of Time with one Exhibit. In addition, on that same date, Walden filed a Reply to Akal's Response to the Government's September 12, 2011 Motion For Extension Of Time.

On September 14, 2011, the court granted the Government's Motion For Extension Of Time and entered a Scheduling Order.

On September 15, 2011, the Government filed the Administrative Record, under seal.

On September 23, 2011, Akal filed a Notice Of Intent To File A Reply Brief and a Notice regarding the Status of the Administrative Record stating that the Government intended to supplement the record with several documents originally omitted from the Administrative Record. On that same date, Walden filed a Response to Akal's Motion For Temporary

Restraining Order and Motion For Preliminary Injunction, together with attached Exhibits A-G. Also on that date, the Government filed a Response to Akal's Motion For Temporary Restraining Order and Motion For Preliminary Injunction, with attached Exhibits 1-3.

On September 26, 2011, Akal filed a Notice Of Intent To File A Reply Brief By September 28, 2011. On that same date, the court convened a Status Conference of the parties to discuss Akal's Motion For Temporary Restraining Order and Motion For Preliminary Injunction.

On September 27, 2011, Akal filed an Unopposed Motion For Extension Of Time to file its Motion For Judgment On The Administrative Record and a Revised Scheduling Order. The Government filed an Unopposed Motion To Amend/Correct The Administrative Record. On that same date, the court issued an Order granting Akal's Motion For Preliminary Injunction, finding that Akal's Motion For Temporary Restraining Order was therefore moot, and setting the expiration date for the Preliminary Injunction as November 15, 2011.[8]

On September 28, 2011, the court granted the Government's Motion To Amend/Correct The Administrative Record and Akal's September 27, 2011 Motion For Extension Of Time. The court also issued a Revised Scheduling Order. On that same date, the Government filed a Supplement to the Administrative Record.

On September 29, 2011, the Government filed a Motion For Reconsideration Of The Preliminary Injunction and a Motion For Reconsideration Of The Government's Request For Security, under seal, along with the Declaration of Mr. Gary Insley.

On September 30, 2011, Walden filed, under seal, a Motion For Reconsideration Or, In The Alternative, Motion For Partial Relief From The Court's September 27, 2011 Order, together with the Declaration of Curtis Casey.

On October 3, 2011, the court issued a Scheduling Order setting an October 7, 2011 deadline for Akal's Response to the Government's September 29, 2011 Motion For Reconsideration and Walden's September 30, 2011 Motion For Reconsideration Or Partial Relief.

On October 5, 2011, Akal filed, under seal, a Motion For Judgment On The Administrative Record and a Memorandum In Support ("Pl. Mot."), together with two Exhibits. On that same date, Akal also filed an Amended Complaint, under seal, together with two Exhibits.

On October 7, 2011, the Government filed, under seal, a Motion To Strike The Documents Attached To Akal's Brief In Support Of Its Motion For Judgment On The Administrative Record And Amended Complaint. On that same date, Akal filed a Response to The Government's Motion For Reconsideration, together with one Exhibit, under seal. In

---

[8] The Preliminary Injunction was subsequently extended until December 12, 2011, by the court's Order on October 14, 2011, and then until December 22, 2011, by the court's Order dated December 9, 2011.

addition, that day, Akal filed, under seal, a Motion To Compel Discovery Responses from Walden and a Motion To Compel Discovery Responses from the Government.  Each Motion attached two Exhibits.

On October 12, 2011, the court convened a Status Conference to discuss the Government's and Walden's Motions For Reconsideration.

On October 13, 2011, the Government filed an Unopposed Motion For Extension Of Time To Respond To Akal's Motion For Judgment On The Administrative Record And For Entry Of A Revised Scheduling Order.

On October 14, 2011, the court entered an Order granting-in-part, denying-in-part, and deferring-ruling-on-in-part the Government's and Walden's Motions For Reconsideration; requiring Akal to post a bond; deferring ruling on the Government's Motion To Strike; and denying Akal's Motions To Compel.  On that same date, the court also entered an Order granting the Government's Motion For Extension Of Time and revising the Scheduling Order.

On October 26, 2011, Akal filed a Notice Of Filing Original Bond Documents, together with one Exhibit.  On that same date, Walden filed, under seal, a Motion For Judgment On The Administrative Record ("Int. Mot.").  Also on that date, the Government filed, under seal, a Motion For Judgment On The Administrative Record And Opposition To Plaintiff's Motion For Judgment On the Administrative Record and Memorandum In Support ("Gov't Mot."), together with the Declaration of Mr. Gary Insley.

On November 9, 2011, Akal filed a Response to the Government's and Walden's Cross-Motions For Judgment On The Administrative Record ("Pl. Resp."), together with an Exhibit, under seal.

On November 17, 2011, the Government filed an Unopposed Motion To Amend/Correct The Administrative Record that the court granted on November 21, 2011.

On November 21, 2011, Walden filed, under seal, a Reply to Akal's November 9, 2011 Response to its Motion For Judgment On The Administrative Record ("Int. Reply") and the Government filed, under seal, a Reply to Akal's November 9, 2011 Response ("Gov't Reply").

## III.   DISCUSSION.

### A.   Jurisdiction.

The October 5, 2011 Amended Complaint in this case alleged that the May 13, 2011 award to Walden was improper on five separate grounds: (1) USMS's determination that Walden was a responsible contractor was arbitrary, capricious and an abuse of discretion; (2) USMS's responsibility determination for Walden violated FAR 9.104-1 and Section L-15 of the solicitation, because Walden failed to disclose the DOL Investigation; (3) USMS's evaluation of Walden's and Akal's technical proposals was arbitrary, capricious, and evidences disparate treatment; (4) USMS's evaluation of Akal's and Walden's "Corporate Experience" was arbitrary,

capricious, and an abuse of discretion; and (5) the CO Award Recommendation was arbitrary, capricious, and an abuse of discretion.  Am. Compl. ¶¶ 86, 91, 96, 99, 103, 106, 114, 123-24.

Pursuant to 28 U.S.C. § 1491(b)(1) (2006), the United States Court of Federal Claims has jurisdiction:

> to render judgment on an action by an interested party objecting to a solicitation by a Federal agency for bids or proposals for a proposed contract or to a proposed award or the award of a contract or any alleged violation of statute or regulation in connection with a procurement or a proposed procurement.

*Id.*

The court has determined that 28 U.S.C. § 1491(b)(1) authorizes the court to adjudicate the claims alleged in the October 5, 2011 Amended Complaint.

### B.     Standing.

#### 1.     Plaintiff Has Standing.

As a threshold matter, a plaintiff contesting the award of a federal contract must establish that it is an "interested party" to have standing under 28 U.S.C. § 1491(b)(1).  *See Myers Investigative & Sec. Servs., Inc.* v. *United States*, 275 F.3d 1366, 1369 (Fed. Cir. 2002) ("[S]tanding is a threshold jurisdictional issue.").  The United States Court of Appeals for the Federal Circuit has construed the term "interested party" to be synonymous with the definition of "interested party" provided in the Competition in Contracting Act ("CICA"), Pub. L. No. 98-369, Div. B, Title VII (1984) (codified in relevant part, as amended, at 31 U.S.C. § 3551(2)(A)).  *See Rex Serv. Corp.* v. *United States*, 448 F.3d 1305, 1307 (Fed. Cir. 2006) (collecting decisions adopting the CICA definition of "interested party" to convey standing under 28 U.S.C. § 1491(b)(1)).  A two-part test is applied to determine whether a protester is an "interested party." A protestor must establish that: "(1) it was an actual or prospective bidder or offeror, and (2) it had a direct economic interest in the procurement or proposed procurement."  *Distributed Solutions, Inc.* v. *United States,* 539 F.3d 1340, 1344 (Fed. Cir. 2008).

A protestor also must show that the alleged errors in the procurement were prejudicial. *See Labatt Food Serv., Inc.* v. *United States*, 577 F.3d 1375, 1378 (Fed. Cir. 2009) ("It is basic that because the question of prejudice goes directly to the question of standing, the prejudice issue must be reached before addressing the merits.") (internal quotation marks omitted); *see also Myers*, 275 F.3d at 1370 ("[P]rejudice (or injury) is a necessary element of standing."). A party demonstrates prejudice when "it can show that but for the error, it would have had a substantial chance of securing the contract."  *Labatt,* 577 F.3d at 1378.  Importantly, a proper standing inquiry must not conflate the requirements of "direct economic interest" and prejudicial error.  *Id.* at 1380 (explaining that examining economic interest but excluding prejudicial error from the standing inquiry "would create a rule that, to an unsuccessful but economically interested offeror in a bid protest, any error is harmful").

The October 5, 2011 Amended Complaint alleged sufficient facts to establish that Akal is an "interested party," *i.e.*, an offeror with a direct economic interest in the April 6, 2010 RFP, as amended.  *See* Am. Compl. ¶ 127.  As to prejudice, the Amended Complaint also alleges that Akal submitted the second best rated offer for the Fourth Circuit contract award, and, as such, there was a substantial chance that Akal would have been awarded that contract but for USMS's alleged errors in the procurement process.  Am. Compl. ¶¶ 86, 92, 107, 115, 125; *see also* Am. Compl. ¶ 128.

For these reasons, the court has determined that Akal has standing to pursue this bid protest in the United States Court of Federal Claims.

### 2.    Defendant-Intervenor Has Standing.

Rule 24(a)(2) of the United States Court of Federal Claims ("RCFC") provides, in relevant part:

> On timely motion, the court must permit anyone to intervene who . . . claims an *interest relating to the property or transaction that is the subject of the action*, and is so situated that *disposing of the action may* as a practical matter *impair or impede the movant's ability to protect its interest*, unless existing parties adequately represent that interest.

RCFC 24(a)(2) (emphasis added).

The United States Court of Appeals for the Federal Circuit has advised that "the requirements for intervention are to be construed in favor of intervention." *Am. Mar. Transp., Inc.* v. *United States,* 870 F.2d 1559, 1561 (Fed. Cir. 1989).  Therefore, our appellate court requires that the trial judge evaluate three factors in determining whether intervention is timely:

> (1) the length of time during which the would-be intervenor[s] actually knew or reasonably should have known of [their] right[s;] (2) whether the prejudice to the rights of existing parties by allowing intervention outweighs the prejudice to the would-be intervenor[s] by denying intervention[;] (3) existence of unusual circumstances militating either for or against a determination that the application is timely.

*Belton Indus., Inc.* v. *United States*, 6 F.3d 756, 762 (Fed. Cir. 1993) (citations omitted; certain alterations in original); *see also* RCFC 24(a)(2).

Walden filed a Motion To Intervene on the same day that Akal filed the Complaint. Walden has established "an interest relating to the . . . transaction that is the subject of [this] action," because it was awarded the disputed contract in this case.  AR Tab 80 at 7816.  The court is not aware of any prejudice to the existing parties that would outweigh the prejudice to Walden if it were denied the opportunity to intervene in this case.  Nor is the court aware of any other circumstances that that would weigh either for or against intervention.  In addition, no party opposed Walden's Motion To Intervene.

For these reasons, on September 7, 2011, the court granted Walden's Motion To Intervene. *See* RCFC 14(a).

### C.    Standard Of Review.

Pursuant to the Tucker Act, 28 U.S.C. § 1491, as amended by the Administrative Dispute Resolution Act of 1996, Pub. L. No. 104-320 § 12, 110 Stat. 3870, 3874 (Oct. 19, 1996), the United States Court of Federal Claims is required to review challenges to an agency decision, pursuant to the standards set forth in the Administrative Procedure Act ("APA").  28 U.S.C. § 1491(b)(4) ("In any action under this subsection, the courts shall review the agency's decision pursuant to the standards set forth in section 706 of title 5."); *see also* 5 U.S.C. § 706(2)(A) (2006) (requiring the reviewing court to "hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law"); *Banknote Corp. of Am.* v. *United States,* 365 F.3d 1345, 1350 (Fed. Cir. 2004) ("Among the various APA standards of review in section 706, the proper standard to be applied in bid protest cases is provided by 5 U.S.C. § 706(2)(A) . . . .").  The United States Court of Appeals for the Federal Circuit has provided the trial courts with specific guidance in how to analyze each of these three APA standards.

First, the United States Court of Appeals for the Federal Circuit has held that a bid award may be set aside if "the procurement procedure involved a violation of regulation or procedure." *Weeks Marine, Inc.* v. *United States*, 575 F.3d 1352, 1358 (Fed. Cir. 2009) (internal quotation marks omitted).  The United States Court of Appeals for the Federal Circuit has clarified, however, that when a contract award is challenged, based on regulatory or procedural violation, "the disappointed bidder must show a clear and prejudicial violation of applicable statutes or regulations." *Axiom Res. Mgmt.* v. *United States*, 564 F.3d 1374, 1381 (Fed. Cir. 2009) (internal quotation marks omitted).

Second, if an award decision is challenged as lacking a rational basis, the trial court "must sustain an agency action unless the action does not evince rational reasoning and consideration of relevant factors." *Savantage Fin. Servs.* v. *United States*, 595 F.3d 1282, 1287 (Fed. Cir. 2010) (internal alterations and quotation marks omitted); *see also Centech Grp., Inc.* v. *United States*, 554 F.3d 1029, 1037 (Fed. Cir. 2009) (holding that the trial court must "determine whether the contracting agency provided a coherent and reasonable explanation of its exercise of discretion, and the disappointed bidder bears a heavy burden of showing that the award decision had no rational basis.") (internal quotation marks omitted).

Third, when a disappointed bidder challenges a federal agency for acting in an arbitrary or capricious manner, the court may set aside the procurement, but "only in extremely limited circumstances." *United States* v. *John C. Grimberg Co.*, 702 F.2d 1362, 1372 (Fed. Cir. 1983). This rule recognizes a zone of acceptable results in each particular case and requires that the final decision evidences that the agency "considered the relevant factors" and is "within the bounds of reasoned decision making." *Baltimore Gas & Elec. Co.* v. *Natural Res. Def. Council, Inc.*, 462 U.S. 87, 105 (1983); *see also Weeks Marine*, 575 F.3d at 1368-69 ("We have stated that procurement decisions invoke highly deferential rational basis review.  Under that standard, we

sustain an agency action evincing rational reasoning and consideration of relevant factors.")
(internal quotation marks and citations omitted).

In addition, on a motion for judgment on the administrative record, the court is required
to determine whether the plaintiff has met its burden of proof to show that the relevant federal
agency decision was without a rational basis or not in accordance with the law. *Weeks Marine*,
575 F.3d at 1348 (instructing the trial court to make "factual findings [under RCFC 52.1][9] from
the [limited] record evidence as if it were conducting a trial on the record"); *see also Afghan Am.
Army Servs. Corp.* v. *United States*, 90 Fed. Cl. 341, 355 (2009) ("In reviewing cross-motions for
judgment on the administrative record, the court must determine whether, given all the disputed
and undisputed facts, a party has met its burden of proof based on the evidence in the record.")
(internal quotations omitted).  The existence of a material issue of fact, however, does not
prohibit the court from granting a motion for judgment on the administrative record, nor is the
court required to conduct an evidentiary proceeding.  *See Bannum* v. *United States*, 404 F.3d
1346, 1353-54 (2005) ("RCFC [52.1] requires the [United States] Court of Federal Claims, when
making a prejudice analysis in the first instance, to make factual findings from the record
evidence as if it were conducting a trial on the record.").

### D.  Whether The Contracting Officer's Responsibility Determination Was Arbitrary, Capricious, Irrational Or Unlawful.

#### 1.  Plaintiff's Argument.

Akal argues that the CO's determination that Walden was a "responsible contractor" is
"arbitrary, capricious, irrational and not in accordance with law," because of Walden's failure to
disclose the DOL investigation.  Pl. Mot. at 18.  The RFP required the CO to make a
responsibility determination for the offeror selected to perform Contract No. DJMS-11-D-0504,
pursuant to the criteria set forth in FAR 9.104-1 and 9.104-2, and the Special Standards of
Responsibility, as set forth in section L-15 of the RFP.  AR Tab 70 at 2422-24.  Moreover,
without "information clearly indicating that the prospective contractor is responsible, the [CO]
will make a determination of non-responsibility."  AR Tab 70 at 2430.

In particular, the Special Standards of Responsibility require that offerors disclose "any
threatened, pending or current litigation."  AR Tab 70 at 2423.  Akal argues that "[w]hen a
government agency undertakes an investigation that can, as here, result in the filing of litigation,
then the investigation necessarily threatens litigation.    Such investigations are not
unlike . . . investigations by Offices of the Inspector General . . . ."  Pl. Mot. at 16.  Although
Walden disclosed the *Bonner* lawsuit, it failed to disclose the DOL investigation that resulted in
the August 8, 2011 DOL Complaint filed against Walden.  *See* AR Tab 24 at 1151-53 (list of
litigation disclosed by Walden to USMS).  According to Akal, this added a "significant new

---

[9] A motion for judgment on the administrative record, pursuant to RCFC 52.1, is akin to
an expedited trial on the Administrative Record and has no counterpart in the Federal Rules of
Civil Procedure.  *See Bannum* v. *United States*, 404 F.3d 1346, 1356 (2005) ("[T]he judgment on
an administrative record is properly understood as intending to provide for an expedited trial on
the record."); *see also* RCFC 52.1, Rules Committee Note (July 13, 2009).

dimension" to the FLSA violations alleged in the *Bonner* lawsuit, because it was originated by a federal agency, "not just . . . by a disgruntled former employee," and therefore "would have been much more significant to a [CO] . . . ."  Pl. Mot. at 17.

Akal also argues that USMS's responsibility determination necessarily was flawed, because USMS did not have all of the relevant information at hand.  Pl. Resp. at 22.  Walden's "intentional omission" of the DOL investigation is material, in part, because debarment was a remedy sought in the DOL Complaint "that could have materially influenced the USMS's consideration of Walden's proposal."  Pl. Resp. at 23.  Under such circumstances, the Fourth Circuit award to Walden should be cancelled.  *See Sw. Bell Tel. Co.*, B-292476, 2003 CPD ¶ 177 WL 223809487 at *8 (Comp. Gen. Oct. 1, 2003) (citing *Universal Techs., Inc.*; *Spacecraft, Inc.*, B-248808.2 *et al.*, 92-2 CPD ¶ 212 at *13 (Comp. Gen. Sept. 28, 1992)).

### 2.    The Government's Response.

The Government responds that if USMS knew of the DOL investigation, then USMS's determination that Walden was a "responsible offeror" would not be arbitrary, capricious or not supported by the record, because of the wide discretion afforded to COs when making responsibility determinations.  Gov't Mot. at 15-16.  Moreover, there is no evidence that USMS knew of the investigation: Akal has not cited any such evidence, nor did Akal make any arguments to the contrary in its October 5, 2011 Motion For Judgment On The Administrative Record.

Furthermore, Walden was not required to disclose the DOL investigation, because the RFP does not require disclosure of any federal investigations, and the words "threatened litigation," by their plain meaning, do not require the disclosure of investigations, because an "investigation does not necessarily lead to litigation."  Gov't Mot. at 14-15.  In the alternative, to the extent this solicitation was ambiguous, "Akal waived its argument by failing to object to the ambiguity before the deadline for receipt of proposals."  Gov't Mot. at 15 (citing *Blue & Gold Fleet, L.P.* v. *United States*, 492 F.3d 1308, 1313-14 (Fed. Cir. 2007)).

In addition, even if Walden was required to disclose the DOL investigation, "the award should still stand[,] because the error was not facially apparent to the USMS."  Gov't Mot. at 15.  The CO could not determine that Walden failed to provide all the required information so the May 13, 2011 award should not be overturned.  Gov't Mot. at 15-16.

### 3.    The Intervenor's Response.

Walden argues that USMS properly found Walden to be a responsible offeror.  Int. Mot. at 10-14.  In this case, "USMS took numerous steps to ensure the awardee would be financially responsible," including hiring Deloitte to conduct a pre-award analysis and obtaining a number of financial documents.  Int. Mot. at 13.  COs can make responsibility determinations based on all the responsibility factors.  Int. Mot. at 14.  The CO considered the *Bonner* lawsuit, but found that it did not affect financial responsibility.  Int. Mot. at 14 (citing *Watts-Healy Tibbitts, JV* v. *United States*, 84 Fed. Cl. 253 (2008); *Southern Foods, Inc.* v. *United States*, 76 Fed. Cl. 769 (2007).

More to the point, Walden was not required to disclose investigations.  Int. Mot. at 14-16.
"One only has to look at the fact that Akal failed to disclose an OIG investigation that was
pending . . . [when] proposals were due," as evidence that disclosure of investigations was not
required by the RFP.  Int. Mot. at 15.  Even if Walden was required to disclose an investigation,
the allegations in the DOL Complaint are based on the same set of facts alleged in *Bonner*.  Int.
Mot. at 15.

Finally, Walden's failure to disclose the DOL investigation does not make Walden *de
facto* irresponsible, as Akal implies.  Int. Mot. at 13.

### 4.      The Court's Resolution.

FAR 9.105-1(a) requires the CO to "possess or obtain information sufficient to be
satisfied that a prospective contractor currently meets the applicable [responsibility]
standards . . . ."  48 C.F.R. § 9.105-1(a).  The United States Court of Appeals for the Federal
Circuit, however, has determined that "the contracting officer is the arbiter of what, and how
much, information he needs."  *John C. Grimburg Co.* v. *United States*, 185 F.3d 1297, 1303
(Fed. Cir. 1999); *see also Bilfinger Berger AG Sede Secondaria Italiana*, B-402496, 2010 CPD ¶
125, 2010 WL 2581928 at *4 (Comp. Gen. May 13, 2010) ("Contracting officers generally are
entitled to rely on information available to them at the time of a responsibility determination,
absent any indication that the information is defective, unsupported, or suspect."); *cf. Sw. Bell
Tel. Co.*, B-292476, 2003 CPD ¶ 177, 2003 WL 22380947 (Comp. Gen. Oct. 1, 2003) (requiring
the Air Force to make a new responsibility determination where the CO was aware of allegations
of impropriety against winning bidder, but "simply assumed" that the responsibility requirement
was met).

In this case, the RFP states:

> *Acceptable Financial Capability* - Prior to award, the apparent successful offeror
> will be required to demonstrate acceptable financial capability.  Failure to provide
> the requested information *would be reason* to determine the offeror non-
> responsible and eliminate them from the competition.  Offerors *may be required*
> to provide additional information such as: . . .

> (g) Disclosure of any threatened, pending or current litigation.

AR Tab 70 at 2423 (RFP section L-15, Special Standards Of Responsibility) (emphasis added).

Thus, it was within the discretion of the CO to determine whether to request information
on "threatened, pending, or current litigation" in the first place.  Further, although failure to
provide requested information may be a basis for a non-responsibility determination, it need not
be, given the discretion afforded the CO.  *See Consortium HSG*, B-292699.6, 2004 CPD ¶ 134,
2004 WL 1432862 at *4 (Comp. Gen. June 24, 2004) ("Without a showing that the CO
unreasonably failed to consider available information, [the GAO] will not consider a protest
challenging the CO's affirmative responsibility determination.").

On December 22, 2010, the CO requested that Walden provide the following additional information: (1) "a list of all cases, litigation, lawsuits and settlements made on any Federal, State, and Local contracts in the past 3 years and a brief explanation," (2) "an explanation of corrective action, if any, taken in each case," and (3) "a list of all threatened, pending or current litigation." AR Tab 23 at 1149. In response, Walden provided a list of 11 pending, current and settled cases, as well as one "threatened litigation" by a Mr. Raul Campos. AR Tab 24 at 1151-53.

Whether or not "threatened litigation" includes "investigations" is not clear. For example, an investigation may be informal and/or in an early stage so that it is difficult to classify it as "threatened litigation." What is not ambiguous is that the CO's December 22, 2010 letter to Walden did not directly and specifically request the disclosure of investigations. *See* AR Tab 23. Moreover, neither Walden nor Akal disclosed any investigations to the CO. *See* AR Tab 24 (list of Walden's disclosed litigation), AR Tab 44 (list of Akal's disclosed litigation). Later, however, the CO did specifically request information on investigations from the Department of Justice. *See* AR Tab 88 (email chain requesting information from DOJ on complaints, investigations, and fraud alerts against offerors). There is no evidence that Walden's failure to disclose the DOL investigation affected the CO's financial responsibility determination. Walden did disclose 12 threatened, pending, current, and settled lawsuits to the CO. AR Tab 24. The May 13, 2011 Determination of Responsibility, explaining the basis for the CO's finding that Walden was a responsible offeror, did not mention any of the litigation disclosed by Walden. AR Tab 63. As such, it appears that the disclosed matters were not given much weight in determining Walden's financial capability. Therefore, it appears likely that disclosure of the DOL investigation would not have changed this finding. Moreover, Walden disclosed the related *Bonner* litigation. Thus, the facts underlying the DOL investigation and their effect on the responsibility determination were known and considered by the CO.

Finally, the contract award in this case was approximately $164 million, so the effect of the DOL investigation on Walden's financial capability to perform the contract likely would be minimal. The Special Standards of Responsibility, as applied to the Fourth Circuit contract, required Walden to show that it had sufficient funds to cover [redacted] in expenses over a three month period. *See* AR Tab 63 at 2184. Walden was able to meet this requirement by showing [redacted]. AR Tab 63 at 2184. Thus, even if Walden eventually was required to pay the full $510,991.70 requested as relief in the DOL Complaint, Walden would still have sufficient funds to meet the Special Standards of Responsibility. *See* DOL Complaint ¶ 7.

For these reasons, the court has determined that the CO's responsibility determination as to Walden was not arbitrary, capricious, irrational, nor a violation of law.[10] *See Bender*

---

[10] Akal's Complaint also alleges that, if Walden did disclose the DOL investigation to USMS, then the CO's determination that Walden was a responsible offeror was arbitrary, capricious, and an abuse of discretion. Am. Compl. ¶¶ 81-86 (Count I). The Administrative Record contains no evidence that the DOL investigation was disclosed to USMS. Akal did not pursue this argument in their Motion For Judgment On The Administrative Record. *See* Pl. Mot.

*Shipbuilding & Repair Co.* v. *United States*, 297 F.3d 1358, 1362 (Fed. Cir. 2002) (stating that responsibility determinations are "largely a matter of judgment" and thus "are normally entitled to considerable discretion and deference," as long as a decision has "a rational basis and [is] supported by the record . . . .") (internal quotation marks omitted); *Grimburg Co.*, 185 F.3d at 1303 (Fed. Cir. 1999) ("Because responsibility decisions are largely a matter of judgment, contracting officers are generally given wide discretion to make this decision.").

### E. Whether The TEB's Evaluation Of Plaintiff's And Intervenor's Proposals Was Arbitrary, Capricious, Or An Abuse Of Discretion.

#### 1. Whether The TEB's Evaluation Of The Corporate Experience Factor Was Arbitrary, Capricious, Or An Abuse Of Discretion.

##### a. Plaintiff's Argument.

Akal argues that the TEB's "Corporate Experience" ratings for both Akal and Walden were arbitrary and capricious, because Akal should have received an "excellent" rating and Walden should have received a "marginal" or "satisfactory" rating. Pl. Mot. at 18-21.

Akal has "provid[ed] CSOs in eleven of the twelve judicial Circuits, for a total of 106 contract years." Pl. Mot. at 19. USMS's summary of Akal's "Corporate Experience" noted that "[Akal] has extensive and relevant experience managing armed security service projects that are very similar in size and scope [to the CSO project]." AR Tab 62 at 2171. This language [redacted], "plainly demonstrat[ing] that USMS should have rated Akal Excellent in Corporate Experience and awarded Akal a full 10 out of 10 points." Pl. Mot. at 20; *see also* AR Tab 58 at 2091 (stating that an "excellent" rating is warranted where "[redacted]").

USMS's summary of Walden's "Corporate Experience" notes only that it "[redacted]." AR Tab 62 at 2169. This does not explain why Walden was found to have the "'[redacted]'" required to earn an "excellent" rating. Pl. Mot. at 20 (quoting AR Tab 58 at 2091). In fact, Walden's response to requests by the CO for "further explanation" regarding Walden's prior corporate experience (AR Tab 26 at 1165-68) did not provide specific information regarding the size, scope, and complexity of Walden's previous contracts, "demonstrat[ing] that, *at best*, Walden should have received a Corporate Experience rating of Marginal or Satisfactory." Pl. Mot. at 21 (citing AR Tab 26 at 1163, 1165-68).

##### b. The Government's Response.

The Government responds that, simply because the description of Walden's corporate experience does not "parrot[]" the RFP's language defining an "excellent" rating, does not necessarily mean that the finding was arbitrary. Gov't Mot. at 20. Walden's "excellent" rating was supported by "earlier assessments that Walden was successful in the industry, had experience with similar projects, and understood applicable laws and licensing requirements," as

---

14-18. Therefore, the court has determined that Akal did not demonstrate that USMS's actions were arbitrary, capricious, or an abuse of discretion as to this count.

well as the fact that Walden currently employs [redacted].  Gov't Mot. at 18 (citing AR Tab 59 at 2106; AR Tab 60 at 2134; AR Tab 62 at 2169).

The Government justifies Walden's rating as rational, even though Walden had no specific court security experience.  Gov't Mot. at 19.  Walden's security contracts for the CDC and the United States Army ("Army") required a similar level of performance.  Gov't Mot. at 19-20.  Furthermore, the RFP did not require any court security experience.  Gov't Mot. at 20; *see also* Gov't Reply at 8-9 (citing AR Tab 59 at 2106; AR Tab 60 at 2111, 2117, 2123, 2128, 2134; AR Tab 62 at 2169).[11]

The Government, however, concedes that Akal should have been awarded an "excellent" rating, because Akal addressed the one weakness identified by the TEB Consensus Report during discussions and the language used to describe Akal's corporate experience [redacted].  Gov't Mot. at 20-21 (citing AR Tab 65 at 2194; AR Tab 84 at 8549; AR Tab 85 at 8554).  But, this would amount to an increase of only two points in Akal's overall score, and thus would not be prejudicial.  Gov't Mot. at 21, 24-25.

## c.      The Intervenor's Response.

Walden argues that the United States Court of Federal Claims applies a deferential standard when evaluating an agency's past experience rating, so that "absent contrary and specific language in a Solicitation providing otherwise, an agency's decisions regarding the relevance and weight afforded to past experience details and references will not be disturbed." Int. Mot. at 19-21 (citing *Data Mgmt. Servs. Joint Venture* v. *United States*, 78 Fed. Cl. 366, 374 (2007); *Blue & Gold Fleet* v. *United States*, 70 Fed. Cl. 487, 507 n.17 (2006); *Univ. Research Co.* v. *United States*, 65 Fed. Cl. 500, 507-08 (2005); *Tech Sys., Inc.* v. *United States*, 98 Fed Cl. 2228, 260 (2001)).

In this case, USMS "fully evaluated each offeror's Corporate Experience . . . and made a subjective but well supported determination that Walden warranted an 'Excellent' rating."  Int. Mot. at 22.[12]  Akal has failed to allege specific facts to challenge this "discretionary judgment

---

[11] Akal concedes that Walden has performed "arguably similar" work to that required by the RFP, but argues the relevant inquiry was whether the type of work warranted Walden receiving an "excellent" rating.  Pl. Resp. at 9.  USMS was thus required to explain the rationale behind its rating, which it did not do.  Pl. Resp. at 9.  Furthermore, "it is important not to equate the similarity of Walden's non-courthouse security work with the courthouse security that Akal has performed," as there are important differences.  Pl. Resp. at 10.  In addition, the three reasons cited by the Government justifying Walden's rating do not, upon critical examination, support the rating.  Pl. Resp. at 11-12.  Finally, Walden's "over-used argument" that agencies have broad discretion in evaluating proposals overlooks the fact that an agency cannot "make an irrational, arbitrary, capricious award," nor can it award a contract, "without a rational explanation."  Pl. Resp. at 12.

[12] Walden also concedes that Akal should have been awarded an "excellent" rating in "Corporate Experience."  Int. Mot. at 21 n.14.  In these circumstances, the court finds that Akal

call." *Id.*  The RFP does not require prior CSO experience, but uses broader phrases like "similar or the same work," "same kinds or types of challenges," and "relevant experience."  AR Tab 2. Therefore, USMS's consideration of Walden's comparable experience was not arbitrary or capricious, and USMS was well within its discretion to rate Walden "excellent."  Int. Reply at 11.

### d.    The Court's Resolution.

The United States Court of Appeals for the Federal Circuit has recognized that "[p]rocurement officials have substantial discretion to determine which proposal represents the best value for the government."  *E.W. Bliss Co.* v. *United States*, 77 F.3d 445, 449 (Fed. Cir. 1996).  Therefore, the trial court should not second guess challenges to "such matters as technical ratings . . . which involve discretionary determinations of procurement officials . . . ." *Id.*

In this case, the RFP defined "Relevant Experience" as:

> [T]he opportunity to learn by doing similar work under similar conditions.  The offeror's experience is relevant to this competition when *similar or the same work performed* work [sic] has lead to the *same kinds or types of challenges* that would be faced during performance of the work described in this solicitation.  The USMS will assess the offeror's relevant experience on the basis of its breadth (*how many similar contracts/task* [sic] have been performed in the past) and its depth (*how many times* the offeror has performed such contracts/tasks).

AR Tab 70 at 2429 (emphasis added).

An "excellent" rating for the "Corporate Experience" sub-factor was to be awarded when "[redacted]." AR Tab 58 at 2091.  Although Akal argues that the TEB and CO never adequately explained a rationale for affording Walden an excellent rating, the Administrative Record evidences that Walden was cited by the TEB for its overall success in the security industry. More specifically, it was cited for two current contracts with the CDC and the Army, and for employing [redacted].   *See* AR 58 at 2091; AR Tab 59 at 2106; AR Tab 60 at 2111, 2117, 2123, 2128, 2134; AR Tab 62 at 2169.

Moreover, the fact that Walden did not have experience providing courthouse security, by itself, does not warrant the court setting the TEB evaluation aside because the SSP does not require previous courthouse experience to earn the highest rating.  *See* AR Tab 58 at 2066.   The RFP invited proposals from offerors that performed *similar* work.  Finally, Akal's argument that Walden did not address concerns about its "Corporate Experience" raised by USMS is also misplaced.  In support of its position, Akal cites to a portion of Walden's January 13, 2011 letter responding to USMS concerns about Walden's lack of experience with the CSO program as it related to Walden's lower offer price.  AR Tab 26 at 1163-64.  Later in that same letter, however,

---

should have been awarded an "excellent" rating, increasing its "Corporate Experience" score from eight to ten, and its overall technical score from 69 to 71.  *See* AR Tab 62 at 2166.

Walden discusses its prior experience at length, emphasizing that, as the seventh-largest American-owned private security company, it can manage the number and size of the CSO contracts.  AR Tab 26 at 1165; *see also* AR Tab 26 at 1165-68.

The court therefore finds that the TEB's evaluation of Walden's "Corporate Experience" was not arbitrary, capricious, or an abuse of discretion.

> **2.      Whether The TEB's Failure To Adjust Technical Scores In The Final Report Was Arbitrary, Capricious, Or An Abuse Of Discretion.**

> **a.      Plaintiff's Argument.**

Akal argues that the TEB erred in failing to adjust point scores in the Final Report, in light of the discussions with offerors following the Consensus Report.  Pl. Mot. at 22-27. Notably, the Administrative Record contains no analysis on how the post-Consensus Report discussions affected the offerors' technical rating.  Pl. Mot. at 22.  "[P]oint scores are entitled to deference, but only if the underlying decisions properly are explained in the Administrative Record."  *Wackenhut Servs., Inc.* v. *Unites States*, 85 Fed. Cl. 273, 297 (2008).

Specifically, Akal should have received higher scores for three evaluation sub-factors and/or Walden should have received lower scores.  First, Akal's score on the "Ability to Recruit and Furnish Qualified Applicants" sub-factor should have been increased to 15 points and Walden's score should have been lowered to 12 points.  Pl. Mot. at 25.  Akal initially was awarded 12 points for this sub-factor, with three identified strengths and two questions/clarifications.  AR Tab 59 at 2096.  After discussions, the Final Report identified six strengths and no questions/clarifications.  AR Tab 62 at 2169-70.  Walden initially was awarded 15 points on the basis of six strengths for this sub-factor.  AR Tab 59 at 2102.  The Final Report consolidated these strengths into only three strengths.  AR Tab 62 at 2167.  The Administrative Record, however, contains no discussion or analysis of the effect of these changes on the final scores.  Pl. Mot. at 25.

Second, Akal's score for the "Develop and Conduct Annual Training" sub-factor should have been increased to 15 points.  Pl. Mot. at 25-26.  Akal initially was awarded 12 points for this sub-factor on the basis of three strengths, one weakness, and one question/clarification.  AR Tab 59 at 2098.  Subsequently, Akal addressed the weakness and the question/clarification, so that the Final Report identified two additional strengths, for a total of five strengths.  AR Tab 62 at 2170-71.  Walden initially was awarded 12 points for this sub-factor, with three strengths and one weakness related to its range plans.  AR Tab 59 at 2104.  Despite USMS raising the weakness with Walden, there is no evidence that Walden addressed the weakness.  AR Tab 30 at 1251.  Nevertheless, the Final Report awarded Walden 12 points.  AR Tab 62 at 2168.  The Administrative Record does not discuss how these changes affected the ratings in the Final Report.  Pl. Mot. at 26.

Third, for reasons previously discussed, the Final Report should have raised Akal's final score on the "Corporate Experience" sub-factor to 10 points, and Walden's score should have been lowered to 6 points.  Pl. Mot. at 26.

In sum, these three adjustments would raise Akal's total technical score to 77 points and lower Walden's total technical score to 70 points. Pl. Mot. at 27. The TEB's failure to make these adjustments to point scores in the Final Report was arbitrary, capricious, and an abuse of discretion.

### b.   The Government's Response.

The Government responds that "adjustments to strengths and weaknesses would not necessarily warrant changes on the USMS's five-category rating system."[13]  Gov't Mot. at 22. USMS has discretion to determine if post-discussion adjustments to technical scores are warranted. Gov't Mot. at 22 (citing *Coastal Int'l Sec., Inc.* v. *United States*, 93 Fed. Cl. 502, 532 (2010); *Femme Comp Inc.* v. *United States*, 83 Fed. Cl. 704, 741-42 (2008)). Akal also stretches the reasoning of *Wackenhut*, because that case dealt with "unexplained, significant changes in scores from preliminary to final worksheets . . . ." Gov't Mot. at 22-23 (discussing *Wackenhut*, 85 Fed. Cl. at 296-98).

The Government also argues that Akal errs in "treat[ing] strengths as interchangeable, ignoring the USMS's direction to value different strengths differently. Akal's position would convert the agency's deliberative process into bean counting." Gov't Mot. at 23. This approach has been rejected by the court. *See Wackenhut*, 85 Fed. Cl. at 292-93; *see also Sys. Research & Applications Corp.*, B-298107.2, 2006 WL 4701814 (Comp. Gen. June 26, 2006). Just because Akal had six identified strengths for the "Ability to Recruit and Furnish Qualified Applicants" sub-factor does not mean it is entitled to an "excellent" rating. Gov't Mot. at 23.

In this case, the strengths that Akal claims are new were recognized in the Consensus Report or in the underlying comments of individual evaluators, so repeating them in the Final Report would not affect the ultimate scoring. Gov't Reply at 11 (citing AR Tab 59 at 2096 (Ability to Recruit); AR Tab 61 at 2136, 2142, 2148, 2154 (same); AR Tab 61 at 2138, 2144, 2150, 2162 (Training)). As to Walden's ability to recruit applicants, the underlying proposal remained unchanged, because the Consensus Report identified no weaknesses or questions, so the fact that the Final Report "does not repeat every word from the consensus report . . . does not mean that the USMS took a different view of Walden's strengths." Gov't Reply at 11. In addition, the Administrative Record indicates that Walden's weakness related to range plans was addressed and mitigated. AR Tab 65 at 2194 ("[A]ll weaknesses were mitigated during discussions[.]"); *see also* AR Tab 93 at 8597-98 (April 21, 2011 letter from Walden to USMS discussing Walden's range plans).

---

[13] The Government points out that, although Walden's scores did not change in the Final Report, Akal's score increased 0.8 for the "General Understanding of the SOW" sub-factor and decreased 0.6 for the "Ability to Maintain Required CSO Standards" sub-factor. *Compare* AR Tab 59 at 2095, 2100, *with* AR Tab 62 at 2166.

### c.     The Intervenor's Response.

Intervenor responds that Akal assumes that all strengths are alike and does not address the importance or significance of additional strengths.  Int. Mot. at 25.  In a "best value" procurement, the focus is on overall "quality," and not on the "number of value propositions." Int. Mot. at 25.  Therefore, Akal does not challenge the  qualitative analysis, but instead asks the court "to re-score the proposals based on a mechanical assessment of the number of strengths in each proposal . . . ."  Int. Mot. at 25.

In its Reply, Walden argues that both it and the Government adequately responded to Akal's argument by pointing to case law showing that identification of new strengths or weaknesses does not automatically lead to new technical scores.  Int. Reply at 11-12.  In addition, Akal's re-scoring "is a desperate attempt to convince the Court that the agency erred in its technical evaluations.  Akal is well aware that this Court will not re-score proposals . . . particularly [for] things like points assigned to specific strengths and weaknesses." Int. Reply at 12.

### d.     The Court's Resolution.

The TEB Final Report states:

The TEB convened in late May 2010 and worked through June 18 to develop a consensus initial evaluation.  Largely based on the TEB findings, the Contracting Officer approved a Competitive Range Determination on July 9, 2010 that included seven offerors.  An eighth offeror was subsequently added to the Competitive Range.

The CO sent discussion questions to offerors by letters dated August 26, January 7, and April 15.

*The TEB reconvened April 26-28, 2010* [sic][14] *to review the offerors* [sic] *responses to the above letters and adjust the ratings accordingly to reflect mitigation of weaknesses in the responses*.  For the most part, the offerors corrected weaknesses, and the final evaluation of the TEB is presented below for the consideration of the Source Selection Official.

AR Tab 62 at 2166 (emphasis added).

The Administrative Record shows that adjustments were made to Akal's score.  *Compare* AR Tab 59 at 2095, *with* AR Tab 62 at 2166.  Nevertheless, as Akal argues, it does not appear that the scores for Akal and Walden substantively changed between the Consensus Report and the Final Report.

---

[14] The actual dates are April 26-28, 2011.  *See* AR Tab 66 at 2237-38.

Akal argues that it should have received a higher score for the "Ability to Recruit and Furnish Qualified Applicants" and "Develop and Conduct Annual Training" sub-factors because new strengths were identified for Akal in the Final Report. These "new" strengths, however, were identified before the Consensus Report and thus were not "new." This was the situation as to Akal's strengths for the "Ability to Recruit and Furnish Qualified Applicants" sub-factor. *Compare* AR Tab 62 at 2169-70, *with* AR Tab 59 at 2096, AR Tab 61 at 2136, 2142, 2148, 2154. Likewise, this was the situation regarding the "Develop and Conduct Annual Training" sub-factor. *Compare* AR Tab 62 at 2170-71, *with* AR Tab 59 at 2098, AR Tab 61 at 2138, 2144, 2150, 2162.

In addition, Akal insists that its weaknesses were addressed during discussions and should have affected its final technical scores. Pl. Mot. at 22-26. In contrast, Akal argues that the CO Award Recommendation's statement that "there were no significant weaknesses in any of the top three offers, as all weaknesses were mitigated during discussions," fails to recognize that Walden's "range plan" weakness identified in the Consensus Report was not addressed. AR Tab 65 at 2194. The Administrative Record, however, clearly demonstrates that this weakness was addressed. *See* AR Tab 93 at 8597 (April 21, 2011 letter from Walden to USMS addressing Walden's range plans). In sum, although Akal and Walden addressed their weaknesses, their scores did not change, evidencing that the TEB consistently did not change scores based on an offeror addressing its weaknesses.

Understandably, the United States Court of Federal Claims has declined to venture too far into the weeds of most bid protests that are factually driven. As such, the most relevant existing guidance in this case is the determination in *Fort Carson Support Servs.* v. *United States*, 71 Fed. Cl. 571 (2006), that the "identification of strengths and weaknesses . . . does not convert the evaluators' subjective judgment into some objective fact that may be disproved in court, nor does it result in a product that can be mechanically summed or subtracted." *Id.* at 591. Likewise, there is no requirement that an agency must change an offeror's technical scores when the offeror's identified strengths or weaknesses improve from an initial evaluation to a final evaluation. *See Coastal Int'l Sec.*, 93 Fed. Cl. at 532 (determining that a change from "significant weakness" to "weakness" "is a technical assessment committed to the agency's expertise"); *Femme Comp*, 83 Fed. Cl. at 741-42 ("The Army's conclusion that [offeror's] proposal revisions prompted by discussions were sufficient to eliminate weaknesses and improve some ratings, but insufficient to be assigned strengths or improve other ratings, was well within the Army's discretion . . . ."); *OAO Corp.* v. *United States*, 49 Fed. Cl. 478, 483 (2001) ("It is not clear to the court, however, that resolution of three technical weaknesses . . . would necessarily have been sufficient to cause a one point change the [sic] [five-point] evaluation scale.").

Akal cites *Wackenhut*, for the proposition that "point scores are entitled to deference, but only if the underlying decisions properly are explained in the Administrative Record." 85 Fed. Cl. at 297. Akal argues that this finding supports setting aside the Final Report, because of the differences in strengths and weaknesses identified since the Consensus Report. In *Wackenhut*, however, one offeror's scores *changed significantly* from the initial report to the final report, *without any explanation*, depriving the court of the ability to determine whether the final scores were arbitrary and capricious. *Id.* ("[T]he court has determined that the [evaluators] violated the APA by failing to create a record to explain and justify the [deleted] increase in point score, or

26

[deleted]% increase, between the [evaluators'] Preliminary and Final Findings . . . so that the court can determine whether the [evaluators] acted in an arbitrary and capricious manner.") (two alterations in original).  In this case, since the scores did not change, the court can determine whether the ratings in the Final Report are arbitrary and capricious.  The court's review of the Administrative Record, particularly the Consensus Report and the Final Report technical scores, does not evidence that the TEB's failure to adjust Akal's technical scores in the Final Report was arbitrary, capricious, or an abuse of discretion.

### 3.    Whether The TEB Engaged In Disparate Treatment In Evaluating Plaintiff's And Intervenor's Proposals.

#### a.    Plaintiff's Argument.

Akal argues that the Administrative Record evidences multiple instances of disparate treatment in evaluating Akal's and Walden's proposals, where both offerors presented strengths, "but the agency provides credit for the strength to only [Walden]."  Pl. Mot. at 27 (citing *CRAssociates, Inc.* v. *United States*, 95 Fed. Cl. 357, 384-85 (2010) (disparate treatment found where both bidders' facility layouts included excessive space, but only the unsuccessful bidder was downgraded for the excessive space).

Akal cites four specific instances of disparate treatment.  First, regarding the "Ability to Recruit and Furnish Qualified Applicants" sub-factor, Walden's ability to manage and expand for special security situations was found to be a "discriminator" in the CO Award Recommendation, but Akal documented multiple instances of the same ability.  Pl. Mot. at 28-29.  Specifically, Akal highlighted their response during the 1993 World Trade Center bombing trials, security support for Manhattan and Brooklyn federal courthouses in the days after the September 11th terrorist attacks, and its experience in the United States Court of Appeals for the Fifth Circuit after hurricanes Katrina and Rita.  Pl. Mot. at 28-29 (citing AR Tab 18 at 987, 1016, 1073-74).  In contrast, [redacted].  Pl. Mot. at 28 (citing AR Tab 59 at 2102).

Second, the determination that "Walden demonstrated the clearest understanding of the importance of a complete and accurate application package for . . . CSO candidates" is not supported by the Administrative Record.  Pl. Mot. at 29-30.  In fact, Akal's description of its recruitment program was more complete and detailed, and Akal's screening process focused only on candidates qualified to meet USMS's requirements.  Pl. Mot. at 29 (comparing AR Tab 17 at 878-89 (Walden's proposal), with AR Tab 18 at 1004-14 (Akal's proposal)).

Third, the CO's finding that "Walden's training plans were more than comprehensive," AR Tab 65 at 2195, is refuted by the record, which shows that Akal's program is at least as comprehensive.  Pl. Mot at 30-31 (comparing AR Tab 17 at 845-47, 895-99 (Walden's proposal), with AR Tab 18 at 1040-49 (Akal's proposal)).

Fourth, although Walden is credited for [redacted] in the "Corporate Experience" sub-factor, "USMS failed to consider or reference" the fact that Akal currently deploys more than 8,000 security guards.  Pl. Mot. at 31 (citing AR Tab 18 at 987).  Similarly, USMS omitted from its review that Akal can provide "entrance control, roving patrol, stationary post assignments,

law and order and monitoring of equipment," but credits Walden for previously providing those same services.  Pl. Mot. at 31 (citing AR Tab 18 at 993; AR Tab 59 at 2106).

### b.   The Government's Response.

The Government responds that "Akal's 'disparate treatment' argument is nothing more than disagreement with the USMS's judgment."  Gov't Mot. at 25.   Regarding USMS's preference for Walden's ability to manage and expand security for special situations, the Government argues that the preparedness for special situations is a qualitative judgment over which reasonable minds could differ, but is not grounds to set aside USMS's preference.  Gov't Mot. at 25-26.  As to Walden's CSO screening process, the same analysis applies.  Gov't Mot. at 27.  In particular, Akal ignores that [redacted].  Gov't Mot. at 27 (citing AR Tab 65 at 2195).  Although Akal believes it has a superior proposal, "[t]his is not a basis for relief."  Gov't Mot. at 27.  Likewise, Akal does not dispute the CO's judgment that Walden's training plan was more than comprehensive, "but contends that '[its] training program is at least as comprehensive as Walden's.'"  Gov't Mot. at 28 (quoting Pl. Mot. at 30).   Once again, this is not a basis for challenging the award to Walden.  Gov't Mot. at 28.

The Government further contends that Akal's argument that USMS completely failed to consider Akal's ability to expand security coverage is wrong.  Gov't Reply at 13 (citing AR Tab 61 at 2136, 2142, 2148, 2154, 2160; AR Tab 59 at 2095 (showing that Akal received 12 points for its "Ability to Recruit and Furnish Qualified Applicants")).  USMS also did not ignore Akal's CSO candidate screening process.  Gov't Mot. at 13-14 (citing AR Tab 65 at 2196-98 ([redacted])).  As to which proposal showed a "clearer understanding" of the importance of the application package, USMS believed that Walden's use of [redacted] demonstrated that Walden had a "clearer understanding."  Gov't Reply at 14 (citing AR Tab 65 at 2195).

Akal's touting the superiority of its own plan is not relevant, nor a basis for relief.  Gov't Reply at 14.

### c.   The Intervenor's Response.

Walden responds that Akal is asking the court to "second-guess[]" the weights assigned to Akal's "purported, self-identified strengths."  Int. Mot. at 29.  USMS's conclusions, however, were "sufficiently explained and documented" and should not be disturbed, because "the assignment of strengths and the determination that an offeror exceeds requirements is left to the discretion of the agency."  Int. Mot. at 29-30; *see also* Int. Reply at 13.  Moreover, USMS is not required to "explain in detail how it compared the minutiae of each offeror's approach against one another or why one offeror's approach is considered superior to another offeror's approach for each and every strength identified by the contracting officer."  Int. Reply at 14.

### d.   The Court's Resolution.

Akal cites four specific examples of disparate treatment where it supposedly should have been given credit for strengths, as Walden was.

Walden was afforded credit in the "Ability to Recruit and Furnish Qualified Applicants" sub-factor for [redacted]. Akal argues that it should have been given similar credit for its responses to other special situations. RFP section C-10 requires an offeror to demonstrate preparedness to "*expand* security coverage" for special situations. AR Tab 70 at 2320 (emphasis added); *see also* AR Tab 58 at 2075 (Individual Technical Evaluation Form for "Ability to Recruit and Furnish Qualified Applicants"). Walden's [redacted] is *actual* experience in [redacted] that is directly responsive to the RFP's criteria. Akal's cited examples, in contrast, did not require it to expand its operations, and thus its experience may rationally be considered not as directly on point. *See* AR Tab 18 at 987, 1016, 1073-74.

Akal also states that it was subject to disparate treatment because the CO Award Recommendation stated that Walden [redacted] (AR Tab 65 at 2204), and the Consensus Report noted that Walden can provide "access control, roving patrol, physical security, and monitoring of equipment." AR Tab 59 at 2106. Akal currently provides 8,000 guards and can provide the same services as Walden. AR Tab 18 at 987, 993. The court, however, has already recognized that Akal was entitled to more credit than was given for the "Corporate Experience" sub-factor.

Akal also alleges disparate treatment regarding USMS's finding that Walden had the "clearest understanding of the importance of a complete and accurate application package for . . . CSO candidates," and that "Walden's training plans were more than comprehensive." AR Tab 65 at 2195. Determining which offeror had the "clearest understanding" of the need for complete application packets or whether training plans are "more than comprehensive," requires qualitative judgments beyond the scope of the court's expertise and within the discretion of USMS evaluators. *See E.W. Bliss*, 77 F.3d at 449 ("Procurement officials have substantial discretion to determine which proposal represents the best value for the government.").[15]

The court therefore finds that Akal has not established that it was subject to disparate treatment.

**F.    Whether The Award Decision Violates FAR 15.308.**

      **1.    Plaintiff's Argument.**

Akal argues that "[t]here is no evidence in the Administrative Record that the SSA exercised his independent judgment for awarding the Fourth Circuit Contract to Walden," as required by FAR 15.308. Pl. Mot. at 36. Instead, the SSA simply signed his name next to the

---

[15] Furthermore, Akal argues that these determinations represented *disparate treatment*, but fails to note they were mentioned in a section entitled "Walden Compared with Akal." AR Tab 65 at 2194. As such they are not independent evaluations of the strengths and weaknesses of each offeror, but rather a *comparison* between Akal and Walden that *necessarily* calls for disparate treatment, *i.e.,* for crediting one but not the other. They do not indicate that Akal was not given credit for strengths in this area. Indeed, the record clearly shows that Akal was credited for similar strengths in these areas. *See* AR Tab 65 at 2204-05 (discussing Akal's recruitment program in some detail and, in particular, noting that "[redacted]"); AR Tab 65 at 2206 ("[Akal] presents an extensive and relevant training protocol . . . .").

word "Approved" on the CO Award Recommendation.  AR Tab 65 at 2198.  Although the SSA can rely on the analysis contained in the CO Award Recommendation, the SSA must "review the agency's evaluations . . . ensure their accuracy, compare the results, and then form his or her independent conclusion . . . ."  *Computer Sciences Corp.* v. *United States*, 51 Fed. Cl. 297, 320 (2002).  There is no evidence in the Administrative Record that the SSA did anything more than sign the CO Award Recommendation, violating FAR 15.308.  Pl. Mot. at 37; Pl. Resp. at 7.

### 2.     The Government's Response.

The Government responds that "[t]he SSA's reliance upon the analysis of others is expressly contemplated by the FAR."  Gov't Mot. at 30 (citing FAR 15.308 ("[T]he SSA may use reports and analyses prepared by others . . . documentation shall include the rationale for any business judgments and tradeoffs made *or relied on* by the SSA . . . .") (emphasis added by defendant)).  Therefore, the award did not violate FAR 15.308.  Gov't Mot. at 30.

Moreover, FAR 15.308 does not require the SSA to "document his scrutiny" as Akal asserts.  Gov't Reply at 17.  Requiring the SSA to document an independent rationale for his own ratings adjustments is inapplicable because the SSA here relied upon the TEB's ratings.  Gov't Mot. at 18.  If the SSA did have to document his reasoning, "it would render meaningless the FAR's provision that the SSA may rely upon the business judgments and tradeoffs of others."  Gov't Mot. at 18.

### 3.     The Intervenor's Response.

Walden responds that this is a best-value procurement awarded to a higher-rated but lower price offeror, so that the SSA was not required to provide detail justifying his award decision.  Int. Mot. at 37.  In this case, Akal cannot show that SSA failed to exercise independent judgment, because "the SSA's signature on the [CO] Award Recommendation indicates the [CO] Award Recommendation was reviewed by and concurred with by the SSA."  Int. Mot. at 37.  Nothing in the Administrative Record indicates that the SSA failed to exercise independent judgment.  Int. Mot. at 37.  By "signing off" on the CO Award Recommendation, the SSA confirmed that he considered the accuracy of information presented.  Int. Reply at 6.  The SSA must only exercise independent judgment in reviewing and approving or disapproving recommendations: "[t]here is no legal authority . . . requiring the SSA to contest conclusions and judgments of others[.]"  Int. Reply at 7.

### 4.     The Court's Resolution

FAR 15.308 states:

The source selection authority's (SSA) decision shall be based on a comparative assessment of proposals against all source selection criteria in the solicitation.  While the SSA may use reports and analyses prepared by others, the source selection decision *shall represent the SSA's independent judgment*.  The source selection decision shall be documented, and the documentation shall include the rationale for any business judgments and tradeoffs *made or relied on* by the SSA,

including benefits associated with additional costs.  Although the rationale for the selection decision must be documented, that documentation need not quantify the tradeoffs that led to the decision.

48 C.F.R. § 15.308 (emphasis added).

FAR 15.308 has two relevant requirements: 1) the SSA must use his or her independent judgment in making a source selection and 2) the source selection decision must be documented, including the rationale for any business judgments and tradeoffs made or relied on by the SSA. FAR 15.308, however, does not require that a *separate* document be written by the SSA indicating the rationale, only that the documentation include any rationales "*made or relied on by the SSA . . . .*" *Id.* (emphasis added); *see also Computer Sciences*, 51 Fed. Cl. at 320 ("[A]ll the SSA is required to do is review the agency's evaluations of past performance, ensure their accuracy, compare the results, and then form his or her independent conclusion based on this information."); *Latecoere Int'l, Inc.*, B-239113, B-239113.3, 92-1 CPD ¶ 70, 1992 WL 15029 at *6 (Comp. Gen. Jan. 15, 1992) ("[T]here is no legal requirement that an SSA personally write the document that reflects the award selection decision.")

In this case, the SSA approved the CO Award Recommendation that included a 10-page memorandum and the enclosed TEB Final Report, both of which document "the rationale[s] for any business judgments and tradeoffs made." *See generally* AR Tab 65. The SSA did not author a separate document, but adopted the rationales of those documents by signing his name next to the word "Approved." AR Tab 65 at 2198.  Moreover, there is no evidence of disagreement among the members of the evaluation team as to who should be awarded the contract.

This situation is not comparable to *Information Sciences Corp.* v. *United States*, 73 Fed. Cl. 70 (2006), wherein the SSA unilaterally changed the ratings of the offerors and made an award selection different than that of the CO's recommendation, without any explanation of why he elected to adopt a dissenting minority report. *Id.* at 119-21.  The key difference between the two cases is that in *Information Sciences*, there was no documentation of "the business judgments . . . *made* . . . by the SSA." FAR 15.308 (emphasis added).  In this case, there was documentation of "the business judgments . . . *relied on* by the SSA." *Id.* (emphasis added). Therefore, additional documentation would be redundant.  *See* RALPH C. NASH & JOHN CIBINIC, *The Source Selection Decision: Who Makes It?*, 16 No. 5 NASH & CIBINIC REP. ¶ 25 (2002) ("[I]n the great majority of procurements, we believe the source selection decision is a *team decision*, and we further believe that is as it should be. . . . [In a situation where there are conflicting recommendations from team members], the job of the SSA is to reconcile the conflicts. If the SSA encounters that rare instance where they cannot be reconciled, the SSA should reach a full understanding of the reason for the conflicts and make a source selection decision based on the best reasoned recommendation.")

Moreover, there is no indication in the Administrative Record that the SSA did not exercise independent judgment.  *See SDS Int'l* v. *United States*, 48 Fed. Cl. 759, 772 (2001) (finding that the SSA's reliance on the evaluators' worksheets did not violate the requirement that the SSA exercise independent judgment where the record contained no suggestion that the SSA did not exercise independent judgment).  This position is consistent with the fact that FAR

15.308 allows the SSA to rely on reports and analyses prepared by others.  *See USfalcon* v. *United States*, 92 Fed. Cl. 436, 453 (2010) ("[N]othing prevents the SSA from basing his judgment upon the evaluations and ratings of others, and indeed [FAR 15.308] expressly allows the SSA's decision to be based on business judgments and tradeoffs made *or relied on* by the SSA." (internal quotation omitted)); *see also Tech Systems*, 98 Fed. Cl. at 246 ("[T]he manner in which the SSA employs his team of experts, including the amount of delegation, is up to the SSA.  He might adopt a source selection plan, for instance, which provides that he will follow the individual evaluations of the technical team members, rather than his own or a consensus view.").  This position is also consistent with the presumption of regularity afforded to government officials.  *See Impresa Construzioni Geom. Domenico Garufi* v. *United States*, 238 F.3d 1324, 1338 (Fed. Cir. 2001) ("[I]n determining whether to require an explanation, the agency decision is entitled to a presumption of regularity.").

### G.   Whether The Contracting Officer's Award Recommendation Was Arbitrary, Capricious, And An Abuse Of Discretion.

#### 1.   Plaintiff's Argument.

Next, Akal argues that the CO Award Recommendation is flawed, because it was based on faulty technical evaluations and failed to provide a comparative assessment of proposals against all source selection criteria, as required by FAR 15.308.  Pl. Mot. at 32.  Instead, "[the CO] used a prohibited conclusory and mechanical recitation of Walden's supposed advantages phrased in the SSP's evaluation criteria terms."  Pl. Mot. at 32-33 (citing AR Tab 65 at 2194 (TEB Final Report); AR Tab 66 at 2240 (CO's May 14, 2011 draft Pre/Post Price Negotiation Memorandum)).  When the CO Award Recommendation does compare Walden to other offerors, it "focuses almost exclusively on Walden's strengths, without discussing Akal's advantages."  Pl. Mot. at 34 (citing AR Tab 65 at 2194-95).

Furthermore, the required comparative assessment "must be a qualitative assessment of their differences, not simply a mechanical point score comparison . . . ."  Pl. Mot. at 34.  In this case, "[t]here is no doubt the [CO] based his [CO] Award Recommendation solely on point scores."  Pl. Mot. at 35.  This is best illustrated by the CO's statement that "[g]iven the extreme closeness of the pricing, the trade-off analysis favors the technically higher rated offer in all circuits . . . ."  AR Tab 66 at 2240 (CO's May 14, 2011 draft Pre/Post Price Negotiation Memorandum).  The CO Award Recommendation also only "provides a purely mechanical recitation of Walden's supposed advantages . . . ."  Pl. Mot. at 35 (citing AR Tab 65 at 2191).  Further, the CO made his best-value determination by "simply counting up the number of satisfactory ratings an offeror received and comparing them to the other offerors . . . ."  Pl. Mot. at 35 (citing AR Tab 65 at 2194).

In addition, Akal argues that the methodology used by USMS in this case is the same as that used in awarding the other eleven federal circuit court contracts.  Pl. Resp. at 5.  These contracts were protested in the GAO by G4S Secure Solutions and Inter-Con, and USMS decided to take corrective action.  *See* AR Tab 90.  Akal speculates that if USMS believed the comparison method would have withstood GAO scrutiny, it would not have taken corrective

action.  Pl. Resp. at 5.  Therefore, it is "unreasonable" for USMS to argue that the same methodology is not problematic in this case.  Pl. Resp. at 5-6.

### 2.    The Government's Response.

The Government responds that the TEB Final Report was not faulty, for reasons previously discussed, and thus the CO Award Recommendation was not flawed simply because it was based on the TEB Final Report.  Gov't Mot. at 28-29.

Ironically, "[a]fter attacking the minutiae of the [CO's] comparative assessment of Walden's and Akal's proposals . . . Akal contends that such assessment does not exist."  Gov't Mot. at 29 (internal citations omitted).  The CO, however, compared all offerors and explained his decision.  Gov't Mot. at 29 (citing AR Tab 65 at 2194-98).  Moreover, "[a]dditional explanation highlighting why Akal was inferior to Walden was not necessary, because the record provides sufficient information to demonstrate a rational basis for the USMS's decision."  Gov't Mot. at 29.

Finally, as to Akal's argument that the CO did not make a qualitative assessment of the proposals, the CO Award Recommendation discussed the specific reasons for Walden's technical superiority, in addition to relying on the point scores.  Gov't Mot. at 30 (citing AR Tab 65 at 2191, 2194-95); *see also* Gov't Reply at 15-17 (citing *Information Sciences*, 73 Fed. Cl. at 118-19; *United Concordia Cos.* v. *United States*, 99 Fed. Cl. 34, 41 (2011); *HomeSource Real Estate Assets Servs., Inc.* v. *United States*, 94 Fed. Cl. 466, 487 (2010); *Westech Int'l, Inc.* v. *United States*, 79 Fed. Cl. 272, 294 (2007)).  Also, the corrective action taken with respect to the award for the other eleven circuits is inapposite, because those GAO bid protests were brought by lower-priced offerors, meaning a trade-off analysis was relevant.  Gov't Reply at 16.  "Moreover, corrective action is not an admission of error."  Gov't Reply at 16.

### 3.    The Intervenor's Response.

Walden also responds that Akal has not shown that the TEB evaluation was flawed.  Int. Mot. at 31.  Even if Akal did make such a showing, any such "small, harmless errors" do not rise to the level required to render the CO Award Recommendation arbitrary and capricious, particularly in light of the fact that Walden had a much higher technical score and a lower offer price than Akal.  Int. Mot. at 31-32.

This case is similar to *Carahsoft Technology Corp.* v. *United States*, 86 Fed. Cl. 325 (2008), wherein the court found an award recommendation adequately documented when the technical evaluations of the awardee and protestor were equal and the CO recommended the contract be awarded to the lower-priced offeror, *i.e.*, a situation in which "a best-value tradeoff [was] not possible."  *Id.* at 349.

Walden also points out that "the [CO] clearly examined the merits of each offerors' proposals, as judged against the RFP evaluation criteria."  Int. Mot. at 36.

Walden also points out that USMS's decision to take corrective action regarding the other eleven circuit's CSO contract awards does not mean corrective action is required here, because in those cases a trade-off was required and the technical scores were closer. Int. Reply at 5 n.2.

### 4.    The Court's Resolution.

Since the court has determined that the TEB Final Report was not flawed, *ipso facto*, the CO Award Recommendation cannot be challenged on that basis.

Akal's argument that the CO Award Recommendation did not include a comparative assessment, as required by FAR 15.308, or a qualitative assessment, is without merit. First, there is an entire section in the CO Award Recommendation titled "Walden Compared with Akal," and the enclosed TEB Final Report includes charts breaking down the point scores in comparison with one another and several pages discussing the strengths of both proposals. AR Tab 65 at 2194-95, 2201-06. To the extent Akal's critique is that the CO Award Recommendation is "one-sided" because it did not discuss Akal's strengths, that argument is also flawed, as the CO Award Recommendation, and the enclosed TEB Final Report, discuss Akal's strengths and weaknesses at length. *See* AR Tab 65 at 2195-98, 2204-06. Moreover, it is not surprising that the CO's discussion of why Walden's proposal was superior does not mention Akal's strengths. In this situation, the CO was required to do no more.

Akal's argument that the CO Award Recommendation does not include a qualitative assessment is also without support. The CO Award Recommendation includes a "comparative narrative" describing why Walden was awarded the Fourth Circuit contract, including a section listing the specific reasons why Walden's proposal was superior to Akal. AR Tab 65 at 2194-95; *see also* AR Tab 65 at 2200-28. Moreover, "the purely mechanical recitation" of Walden's advantages cited by Akal is simply a summary of why Walden was awarded the Fourth Circuit contract. AR Tab 65 at 2191. Akal's assertion that the CO made his determination by "counting up the number of satisfactory ratings," is belied by the statement, in the same paragraph as the one cited by Akal, directing the reader to: "See the comparative narrative below on the specific strengths of each proposal." AR Tab 65 at 2194. Once again, the CO was required to do no more.[16] *See HomeSource*, 94 Fed. Cl. at 487 ("Although the record . . . is not as detailed as perhaps it could have been, the AR provides sufficient information to demonstrate a rational basis for the government's determination . . . ."); *see also Westech*, 79 Fed. Cl. at 294 ("While the [evaluation board's] Report does not provide an exhaustive comparison . . . that level of detail is not required."). As for any "corrective action" taken by USMS regarding other security contracts, the court determines that action to be irrelevant to the court's resolution of this case.

---

[16] Akal also suggests that, because USMS decided to take corrective action after bid protests were filed regarding the other eleven CSO contract awards, there was also an error in this case. The decision to take corrective action involved different offerors, different proposals, different technical evaluations and different contract prices. It is not an admission of error, especially not in this case. Moreover, the situation with regards to the other eleven circuits is more complicated because it appears to involve a tradeoff, because Akal was rated higher technically, but the protestors had a lower price. *See* AR Tab 65 at 2190-93 (describing technical scores and offer prices for the most competitive bids for each circuit).

## IV.    CONCLUSION.

For the reasons discussed herein, Akal is entitled to a two point increase in its "Corporate Experience" score, raising Akal's total technical score from 69 to 71, and its overall score to 86.5.  *See* AR Tab 65 at 2194.  Nevertheless, Akal's recalculated technical score is still well below Walden's total technical score of 77 and overall score of 94.1.  AR Tab 65 at 2194.  In addition, Walden remains the lower-priced offeror.  *See* AR Tab 65 at 2191.  Accordingly, Plaintiff's Motion For Judgment On The Administrative Record is denied, and the Clerk of the Court is directed to dismiss the Complaint.

**IT IS SO ORDERED.**

s/ Susan G. Braden
**SUSAN G. BRADEN**
**Judge**